UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:22-cv-60854-AHS

PAUL FORSYTHE,

     Plaintiff,

v.

STARBOARD YACHT GROUP, LLC
and JAKE STRATMANN

     Defendants.

_____|

### SWORN DECLARATION OF JAKE STRATMANN, AS CEO AND INDIVIDUALLY

     I, JAKE STRATMANN, under penalty of perjury and from personal knowledge, make the following Declaration:

1.     My name is JAKE STRATMANN, and I have personal knowledge regarding the facts contained in this Affidavit and am over the age of eighteen years old.

2.     I am the CEO of STARBOARD YACHT GROUP, LLC.

3.     SYG engages in ongoing efforts to ensure compliance with FLSA regulations, including consulting with human resources experts and legal counsel regarding employment classifications and responding appropriately to Department of Labor ("DOL") inquiries.  By way of example, in 2017, the DOL conducted an audit and determined that one employee--not Plaintiff's role or title-- needed to be paid overtime since that employee was primarily secretarial.

4.     SYG pays weekly, not bi-weekly.

5.     SYG's skilled trades hours are 8:00 am to 4:30 pm, with half an hour for lunch.

1

6.      At SYG, managers are accountable for overseeing departments, which often require them to arrive before their staff and ensure end-of-day managerial jobs are completed, including scheduling and following up with customers.

7.      Managers are exempt from overtime and do not have a schedule for lunch, breaks, and start and end times, however, they are accountable to support their roles and responsibilities.

8.      SYG nor I control Managers' lunch breaks since managers are required to manage their direct reports' lunch breaks and schedules.

9.      During FORSYTHE's employment, SYG follows a standard Expense reimbursement process managed by Theresa LaRusso, the office administrator and bookkeeper.

10.      SYG offers commissions on sales of Seakeeper units and Humphree fin units to managers and sales staff who bring in the leads.  Additionally, SYG offers performance-based pay and bonus structures based on operational key indicators and company goals.

11.      FORSYTHE was not an outside salesperson.

12.      FORSYTHE's salary was not a function of hourly pay.

13.      FORSYTHE was paid a base salary of $55,000 annually. (Ex. 1 Employment Offer)

14.      Any deductions to FORSYTHE's salary were for his invoices for parts for his own personal boat. (Ex. 2-Boat bills)

15.      While employed, FORSYTHE ordered parts for his personal boat and requested that the charges be deducted from his paycheck—not due to any

disciplinary deduction or a deduction for a partial day absence.

16.    SYG did not dock FORSYTHE's pay due to any absences for partial days, and SYG even paid him though he claimed to be out due to COVID, which he never had.

17.    FORSYTHE never earned a bonus at SYG during his short stint of employment (7 months).

18.    FORSYTHE never worked on boats directly, nor did SYG bill for his time working on boats as this was not part of his job function.   FORSYTHE was a Licensed Captain to operate vessels.  It was FORSYTHE's job to decide who would operate the vessels if required by SYG to complete their scope of work between himself and other competent employees.

19.    FORSYTHE kept track of his hours worked via SYG's payroll system.

20.    During his job interview, I told FORSYTHE that the position was a salary position due to SYG seeking to fill management positions requiring direct reports, which require oversight of hourly workers, managerial decisions, disciplinary actions, and responding to customers during off hours, result in working hours outside of our regular operating hours, which is from 8:00am-5:00pm, Monday through Friday.

**From:** Jake Stratmann
**Sent:** Saturday, December 21, 2019 7:34 PM
**To:** Paul Forsythe (paul_forsythe@att.net) <paul_forsythe@att.net>
**Subject:** Starboard Yacht Group ------- 2020 ROLL OUT EOS ---------

Paul,

I've thought much about our time discussing SYG and your history and career in service.

I believe you to be a perfect fit for SYG, not 100% sure the parts manager / service manager is the perfect long-term fit but if you're up for it, it would fill an immediate void we desperately need filled and give you access to understand all aspects of the industry, SYG and tradesmen we are working with at the moment.

The biggest challenge would be learning QuckBooks which we are running 2020 contractor edition server with 5 users at the moment.   Good news, is that we are changing the way we are using it and a time we are all learning new things so better for us all to learn together.

For a better understanding of what you'd be getting into with SYG now is to read the book Traction by Geno Whickman which I just sent via text.

For a preliminary starting date how does January 6th work for you.   Compensation plans are being worked on now for the growth plan goals from 3 to 5M with a base salary of 55K paid weekly and 1 week PTO time available per calendar year.   This would increase by 26% if on track and paid throughout each quarter and doesn't include sales commission from Seakeeper units.

I have attached a generic offer of employment for review only as this will be modified based on a second interview with Theresa and Jack which we would like to do maybe Friday next week if you're available.

Let me know your thoughts.

Respectfully,

Jake Stratmann
President

21.     FORSYTHE was hired to replace Jack Haney in the Integrator position and was strategically hired to fill the void of Parts Manager.  Within the first week of his hire, SYG onboarded Elvis Lazama for the Parts Manager position.  FORSYTHE managed the Parts Manager (Elvis Lazama), Service Manager (Chris Rizo), in addition to his other core responsibilities as Project Manager, Operations Manager, Sales, and Integrator.



22.     FORSYTHE never performed the job of Parts Manager and assumed the General Manager position, managing the parts and service department heads, including Project Management.   As the General Manager, he did not have any required training in light of his claimed experience with the US Coast Guard, where he claimed to have supervised at least 70 employees reporting directly to him.   Rather, his role was to supervise and manage direct reports.   (Ex. 3 Résumé)

23.     EOS is the Entrepreneurial Operating System, which was developed by Gino Wickman in his multiple books, including *Traction*.

24.     SYG runs on the EOS business model starting in 2019.

25.    FORSYTHE willingly and knowingly accepted the additional role of Integrator and stated that he "Gets it [and] wants [the] role and "has the capacity to do it".

26.    The SYG leadership team accepted FORSYTHE as its EOS Integrator, the highest management position at SYG under the CEO. (Ex. 4 Org chart)

27.    Throughout his employment, FORSYTHE was involved in critical managerial functions, including the direct management of operations and working closely with sales and Finance, the integration of complex products, and the oversight of major projects.

28.    As the General Manager/EOS Integrator, Plaintiff held the CEO accountable for the CEO's visionary role at SYG.

29.    During weekly Level 10 meetings run by FORSYTHE, as SYG's General Manager/EOS Integrator, FORSYTHE advised and managed SYG's lunch break schedules.   He had the ability and exercised his discretion to modify lunch schedules in compliance with labor and regulatory requirements.  This included ensuring that all hourly employees who worked through lunch would get paid for their time, including any hours over 40.

30.    FORSYTHE was responsible for ensuring that SYG's time tracking system and payroll processing were used by the employees and that the employees time records where accurate for Finance to use for payroll.   All hourly workers reported to Paul and if there was an issue with their pay they would report directly to their managers who would report to FORSYTHE and he would be the person responsible to get with Finance and resolve the issue making sure they were paid correctly.

31.     FORSYTHE was also a key person and integral in SYG's Accountability

Charts (Composite Ex. 5 Accountability Chart):

| Name | Task | 12/17/19 | 1/7/2020 | 1/21/20 | 2/11/20 | 2/18/20 | 2/26/20 | 3/3/20 | 3/11/20 |
|---|---|---|---|---|---|---|---|---|---|
| **MARCH 15th 2020** | | | | | | | | | |
| | Revenue: ▉ | | | | off track | on track | on track | on track | on track |
| JON | Demo boat being showed and used minimum twice per month | Not Done | on track | On track | on track | off track | off track | off track | off track |
| THERESA | Scorecard in place with all data | Done | on track | On track | on track | on track | on track | on track | off track |
| JAKE | 6 Seakeeper sales | Done | on track | On track | on track | on track | on track | on track | on track |
| RENEE | Project Management software + CRM being used by all manage | Not Done | on track | On track | on track | on track | off track | off track | off track |
| PAUL | All teams have their staffing needs RPRS | Not Done | on track | Off track | on track | on track | on track | on track | off track |
| BENNY | Team RPRS | Done | on track | | on track | on track | on track | on track | |
| BENNY | All jobs are < ▉ labor overrun and < ▉ of parts unaccounted for | Done | on track | | on track | on track | on track | on track | |
| BENNY | Maintinance & inventory of equipment | Not Done | on track | | off track | on track | off track | on track | |
| ELVIS | All managers request parts with full information | Not Done | | Off track | | off track | off track | | on track |
| ELVIS | Paperwork done everyday to post invoices | Done | | On trck | | on track | off track | | on track |
| ELVIS | < ▉ of parts unaccounted for | Done | | Off track | | off track | on track | | on track |
| ELVIS | Inventory in place for all the parts | Not Done | | On track | | off track | off track | | off track |
| CHRIS | Mechanics Team decision of RPRS | Not Done | off track | On track | on track | on track | on track | on track | off track |
| CHRIS | All jobs are < ▉ labor overrun and ▉ of parts unaccounted for | Done | off track | On track | on track | on track | on track | on track | on track |
| GERALDO | Hire 2 full-time Detailing Crew RPRS | Not Done | off track | On track | | on track | on track | on track | off track |
| GERALDO | All jobs are < ▉ labor overrun and ▉ of parts unaccounted for | Done | off track | On track | | on track | on track | on track | on track |
| PaUL | Open order screen and print out original work orders | Done | | Off track | | on track | on track | | on track |
| PAUL | Develop and implement, measure PM process for SYG Ops | Not Done | on track | On track | on track | on track | on track | on track | on track |
| PAUL | Estimating process in place for labor/parts with team | Done | on track | On track | on track | on track | on track | on track | on track |
| PAUL | All jobs are < ▉ labor overrun and <5% of parts unaccounted for | Done | off track | On tack | on track | on track | on track | on track | on track |
| PAUL | Have 13 L-10 & Ops meetings rated 7+ | Done | on track | On track | on track | on track | on track | on track | on track |
| JAKE | Develop sales process to handover to Ops | Not Done | on track | On track | on track | on track | on track | on track | off track |
| JAKE | State of the Company address | Not Done | on track | On track | off track | off track | off track | off track | |
| JEREMY | All team RPRS | Done | on track | On track | on track | on track | on track | on track | |
| JEREMY | All jobs are < ▉ labor overrun and <5% of parts unaccounted for | Not Done | off track | Off track | on track | off track | off track | | |
| JON | Hire cross-trained mechanic like Gus | Not Done | off track | Off track | off track | off track | off track | off track | on track |
| JON | All jobs are < ▉ labor overrun and ▉ of parts unaccounted for | Not Done | on track | On track | on track | on track | on track | on track | off track |
| RENEE | Create a visual SYG proven process (right tools, information, p | Not Done | on track | On track | off track | off track | off track | off track | off track |
| RENEE | Align website and marketing with new vision | Not Done | on track | On track | off track | off track | off track | off track | off track |
| RENEE | Have ▉ eads from each Boatshow (Miami x2 + West Palm) | Done | on track | Off track | | on track | on track | on track | on track |
| THERESA | Collect $XXX of past A/R ( ▉ of past A/R) | Not Done | off track | ? | off track | off track | off track | | |
| THERESA | Time sheet solution | Not Done | on track | On track | on track | off track | off track | off track | off track |



32.     The Parts Department is one of the core business of SYG and is permanent and not temporary.  FORSYTHE managed the Parts Manager however it was FORSYTHE's responsibility to work with the managers and technicians to make sure the parts manager had the right information and ordered the correct parts. FORSYTHE was also accountable for making sure our inventory parts on hand were set up at the correct levels for the productivity and needs of the service and operations to satisfy customer demands and needs.

33.     In his short stint (approximately 7 months) at SYG, FORSYTHE made suggestions and recommendations about employees who were engaged in

8

altercations, made recommendations about whether an employee could safely perform his job duties in light of impairments, terminated an employee, and directed more than two employees' work frequently, and was consulted by the CEO on matters of importance to SYG, such as budgets, estimates, sales opportunities, profitability, compensation of employees and evaluation of employees.

34.     During FORSYTHE's employment, he would provide coaching, counseling, and disciplinary write-ups to employees, including Elvis Lazama, the Parts Manager, and Jack Haney (Project Manager).

35.     FORSYTHE was integrally involved in meetings regarding an employee's safety in the workplace and whether that employee could safely perform his essential job functions, this includes him directing the meeting in my office which he collaborated with others in review of the employee. (Ex. 6 Forsythe QC)

36.     FORSYTHE performed the job of General Manager, Service Coordinator, Project Manager, and Integrator, which included the Parts and Service Managers reporting to him. (Ex. 7 Forsythe's Instructions to Employees; Ex. 8 System check)

37.     FORSYTHE was present at every interview during his employment.  In addition to making recommendations on whether to hire or fire employees, he also hired, fired, and disciplined them.  This was in addition to his role as an Integrator.

38.     As an EOS Integrator, FORSYTHE's functions were to lead, manage, and hold employees, and me, as the CEO, accountable, streamline operating procedures, resolve conflict in a healthy manner and implement the EOS process.

39.     As the SYG Integrator, FORSYTHE would accompany me as the CEO in order to make recommendations based upon his observations.  By working in close

contact with me as the CEO, FORSYTHE had free access, unlike other employees, to the industry's inner workings, clientele and operations.   This included access to SYG's bookkeeping, loan documents, pricing, policies and payment terms.  FORSYTHE had this access to perform his duties as General Manager/EOS Integrator.



40.      FORSYTHE created the criteria upon which SYG evaluated its employees to evaluate performance and support pay adjustment, promotions and bonuses. Employee evaluations directly correlate to SYG's productivity and profit margins,  which FORSYTHE had full access to and was responsible for SYG's profitability.

41.     FORSYTHE handled employee evaluations and enforcement of company policies and procedures to include employee discipline, and he was not just a manager but an executive manager.

42.     FORSYTHE issued Employee Warnings to more than two employees (Ex. 9 Employee Warning):

## Employee Warning Notice

**Paul  Forsythe**
To  Jake Stratmann

(i) You forwarded this message on 3/5/2020 12:02 PM.

Employee Warning Notice.docx
22 KB

Let me know if you approve
Paul

### EMPLOYEE WARNING NOTICE

**Name:** JACK HANEY                    **Department:** ADMINISTRATION

**Job Title:** PROJECT MANAGER          **Date:** 04 MAR 2020

You are hereby notified that your performance in the following area(s) is unsatisfactory at this time. We want you to remain employed at this company, but failure to correct deficiencies may result in terminations of your employment.

| Punctuality | Job Knowledge | Production | Safety | Completeness |
|---|---|---|---|---|
| Attendance | Job Skills | Accuracy | Cooperation | _____ |
| Attitude | Leadership | Obedience | Conduct | _____ |

You are on probation for _30_ days.

**Explanation and further details:** This is an official written reprimand of your failure to act in a professional manner in the work place. We at Starboard Yacht Group endeavor to maintain a healthy and comfortable environment for our employees. Any behavior or actions that violate the comfort of employees shall not be tolerated and will be strictly dealt with.

This notice is a warning against such future behavior. Failure to comply with organizational norms and disrupting office environment will lead to disciplinary action against you. You are required to issue a formal apology for your behavior. A copy of this warning will also be added to your employee record. This is to warn you that such language is not tolerated at Starboard Yacht Group. Employees are at all times expected to respect co-workers and maintain a cordial and comfortable office environment.

Profanity makes others around you uncomfortable. Please refrain from using such uncivilized language in the future, else disciplinary action shall be taken against you. This type of behavior is detrimental to the company and for future business.

**Follow-up action needed**

___It is imperative to work on your personal skills with other employees here at Starboard Yacht Group. Please take this time to reflect and come up with a viable plan to fix some of your frailties so we can continue to progress forward working together as a team player aboard Starboard Yacht Group.  Your commitment to the company and your sacrifice to put the company first is crucial to all of all success.

_____

_____

I acknowledge receipt of a copy of this warning and ACCEPT OR APPEAL _____

**Signature:** _____ -

11

43.     FORSYTHE was not tasked, nor was he responsible for working on clients' boats or performing manual work.



**RE: Scout Settle Up on bills.**

**Paul Forsythe**
To  paul@h2oyacht.co; ● Jake Stratmann
Cc  ○ John Hughes Hughes, Jr.; ● Gus Mena; ○ Chris

↩ Reply  ↩ Reply All  → Forward
Wed 3/25/2020 7:45 PM

Good Evening John,
This is Paul from SYG and I am taking care of the Flir upgrade camera to make sure you get exactly what you want for the camera.
I have over 23 years of experience working in the USCG as an Deck Watch Officer captain on large vessels. I am familiar working with FLIR products and want to make sure you get the right camera quality and functionality.
There are several options and will list the functions and you can tell me what you want.
Cameras are fixed or rotate 30* 60* or 360*.
 1. ZOOM quality—how far do you want the camera to see? 1000 yards or five miles away. That makes a difference for vessel safety collision avoidance
2. Imaging capabilities- there are three different imaging capabilities FLIR offers 1 night vision—green display light for night vision—does not decipher heat or temperature. 2 thermal images temperature changes by color screen and 3 infrared imaging which displays heat sources on black and white displays. FLIR website can show you the difference.  With thermal options you can pick persons in the water or vessel engines running hot from heat source for safety as well.
3. Image Quality IE High Definition.
4. Gyro stabilized camera which when running at high speeds will stay stable and track at a set direction or can be set in track mode at certain degrees and will keep the camera on that object even if you turn the vessel.
Please give your thoughts as to what you were wanting in the camera. You currently have the Pan tilt thermal camera installed. A will look at your feed back and find you the right camera at our best price.
Respectfully

Paul Forsythe
Starboard Yacht Group
Captain/ Service Coordinator/ Project Manager

**From:** paul@h2oyacht.co <paul@h2oyacht.co>
**Sent:** Wednesday, March 25, 2020 6:58 PM
**To:** Jake Stratmann <jake@starboardyacht.com>
**Cc:** Paul Forsythe <Paul@starboardyacht.com>; John Hughes Hughes, Jr. <jwhughes@jwhughes.com>
**Subject:** Scout Settle Up on bills.

Hello Gents,

As discussed on the phone call we talked about whatever was on the bill and was paid for but didn't get done lets make it right and whatever needs to be done but wasn't paid for send John the quote for it. So let me help explain these issues one by one so we are all on the same page.

Trim Tabs - John, we failed to find out that these trim tabs were actually needing to be replaced towards just 4 days prior to delivery - the seals were popping out even

---

**Re: Pursuit punch list**

**Paul Forsythe**
To  ● Jake Stratmann
Cc  ○ Geraldo; ● Elvis Starboard Yacht Group PARTS DEPT; ● Theresa; ○ Chris; ● Gus Mena
ⓘ You replied to this message on 3/24/2020 8:21 PM.

↩ Reply  ↩ Reply All  → Forward
Tue 3/24/2020 8:09 PM

Jake
We (Jack) received the oil sample report back and completely disregarded what was on it. His words to Elvis was that does me no good! Recommend we change the oil from water! (Chris can attest to this because he saw the report on his desk. So is this our fault now we didn't report the water earlier? Jack did the complete service and I have no idea what he did. Anyway yes let's gat the boat back here and we can get the quotes done
Paul

On Mar 24, 2020, at 7:59 PM, Jake Stratmann <jake@starboardyacht.com> wrote:

Paul,

I have been communicating with Linda reading in copy regarding the Pursuit owned by Richard Tickten we recently serviced.

We performed bottom services and pulled oil reports which returned needing service which Jack had on his list to discuss with the owner.

Richard used the vessel and has the below issues.

1. Vibration
2. Low oil pressure on stbd eng
3. Auto pilot
4. Hatch turn t handle in deck hatch

12

RE: Richmand Italia

Paul Forsythe

To    Jake Stratmann;  Theresa;  Elvis Starboard Yacht Group PARTS DEPT

| Reply | Reply All | Forward |

Thu, 5/16/2022

Start your reply all with:

Jake
All that work is done and if you have a chance tomorrow to QC with me and go over all the things you would like see done for a proper QC that would help me!
Make sure boats do not leave until everyone is happy

Paul

From: Jake Stratmann <jake@starboardyacht.com>
Sent: Thursday, March 26, 2020 6:20 PM
To: Theresa <theresa@starboardyacht.com>; Paul Forsythe <Paul@starboardyacht.com>; Elvis Starboard Yacht Group PARTS DEPT <Elvis@starboardyacht.com>
Subject: Richmand Italia

Guys,

This is what I've signed off on so far with balance.

| Memo | Num | Date | Due Date | Aging | Amount | Open Balance |
|------|-----|------|----------|-------|--------|--------------|
| Estimate 2000 5608 | 2000-12970 | 03/26/2020 | 03/26/2020 | | | |
| storage | 2009-12961 | 03/24/2020 | 03/27/2020 | | | |
| Seakeeper | 2009-12972 | 03/23/2020 | 03/23/2020 | 3 | | |
| bilge pump | 2009-12950 | 03/19/2020 | 03/19/2020 | 7 | | |
| dry out liner | 2000-12951 | 03/19/2020 | 03/19/2020 | 7 | | |
| bottom paint | 2009-12972 | 03/19/2020 | 03/25/2020 | 1 | | |
| Total | | | | | | |

Respectfully,

44.    FORSYTHE performed numerous roles, including enforcing SYG's drug policy.

45.    FORSYTHE also documented numerous employees' failure to comply with SYG's policies, which resulted in the termination of employment for several employees.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing statements in this Declaration are true and correct.*

3/18/2024
Date

Jake Stratmann, CEO
Starboard Yacht Group, LLC

13